UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN B. DARR, AS HE IS THE DULY APPOINTED AND ACTING RECEIVER OF GREEN EARTH ENERGY PHOTOVOLTAIC CORPORATION and GREEN EARTH WAMOGO, LLC,<br><br>      Plaintiff,<br><br>            v.<br><br>CHRISTOPHER SCYOCURKA, PAIGE SCYOCURKA, TAYLOR SCYOCURKA, GREEN EARTH AND MARINE, LLC, TODD SCYOCURKA, and GREEN EARTH ROOFING SOLUTIONS LLC,<br><br>      Defendants. | Civil Action No. 22-10831-MGM |

MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 54, 64)

March 27, 2026

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

This action was commenced by Stephen B. Darr ("Darr," "the Receiver," or "Plaintiff"), in his capacity as receiver of Green Earth Energy Photovoltaic Corp. ("GEE") and Green Earth Wamogo, LLC (together with GEE, "Green Earth"). Darr was appointed as receiver for Green Earth in an action that consolidated claims brought by Christopher and Paige Scyocurka (together "the Scyokurkas") and GEE against Keybank National Association ("KeyBank") and claims KeyBank

brought against Green Earth and the Scyokurkas.[1] (19-cv-30123, Consol. Order, Dkt. No. 104; Order App'ting Rec'r, Dkt. 113.) The Receiver alleges the Scyocurkas, as the sole shareholders and directors of GEE, approved transfers of GEE assets, for less than reasonably equivalent value, to benefit themselves and their family members at times when GEE was unable to pay its debts as they became due.[2] (Compl., Dkt. No. 1.) Similar claims are also asserted against another entity controlled by the Scyocurkas, Green Earth and Marine, LLC ("Marine"); their daughter, Taylor Scyocurka ("Taylor"); an entity she owns, Green Earth Roofing Solutions, LLC ("Roofing"); and Christopher's brother Todd Scyocurka, formerly GEE's chief financial officer (collectively, including the Scyocurkas, "Defendants").

More specifically, the Receiver contends the Scyocurkas are liable to Green Earth under five alternative legal theories. First, that the Scyocurkas breached the fiduciary duties they owed to Green Earth by diverting to their personal benefit assets that GEE needed to remain solvent (Count I). Second, the Receiver asserts Green Earth can recover as a creditor under the Uniform Fraudulent Transfer Act ("UFTA"), Mass. Gen. Laws ch. 109A, §§ 5 and 6 because the Scyocurkas approved fraudulent transfers either with an intent to defraud creditors (Counts II) or at a time when Green Earth had become insolvent (Count III). Third, to the extent any of the identified transfers were intended to be loans to shareholders, Green Earth seeks repayment (Count IV). Fourth, under Mass. Gen. Laws ch. 156D, § 6.41(a) and (c), the Scyocurkas are personally liable to repay GEE for improper distributions they approved as GEE directors (Count V) and received as shareholders (Counts VI).

---

[1] GEE and the Scyocurkas appealed the order appointing Darr as receiver for Green Earth. (19-cv-30123-MGM, Not. of Appeal, Dkt. No. 116.) On October 18, 2022, the First Circuit affirmed the appointment. (19-cv-30123-MGM, First Cir. Op., Dkt. No. 225.)

[2] Before filing this action, Darr moved for authority to commence litigation against the Scyocurkas and others related to alleged misuse of GEE assets. The court granted the motion, without making an assessment as to the merits of the proposed action. (19-cv-30123-MGM, 4/15/2022 Order, Dkt. No. 176.) Once filed, the case was stayed until after the First Circuit affirmed the court's decision appointing the receiver. (6/15/2022 and 10/19/2022 Orders, Dkt. Nos. 6, 10.)

Fifth, the Receiver contends the court should pierce the corporate veil and hold the Scyocurkas personally liable for GEE's debts because they disregarded corporate formalities while operating GEE (Count XVI).

As to the other defendants, the Complaint includes claims under the UFTA against Taylor, (Counts VII and VIII), Marine (Counts X and XI), and Roofing (Counts XII and XIII). The Receiver also asserts Todd and Taylor are liable to Green Earth because they aided and abetted the Scyocurkas' breach of fiduciary duties (Count IX), and Roofing has successor liability for GEE's debts as a result of a de facto merger (Count XIV) or because Roofing is an alter ego of GEE (Count XV).

Following discovery, the Receiver filed a motion for summary judgment on the counts asserting liability (1) against the Scyocurkas, Taylor, and Todd for breaches of fiduciary duty (Counts I and IX); (2) under the UFTA, and against the Scyocurkas, Taylor, Marine, and Roofing, for transfers GEE made despite insolvency (Counts III, VIII, XI, and XIII); (3) for amounts GEE loaned to the Scyocurkas that they have not been repaid (Count IV); (4) for improper distributions approved and received by the Scyocurkas (Counts V and VI); and (5) against Roofing as a successor or alter ego of GEE (Counts XIV and XV). (Dkt. No. 54.) The Receiver contends the undisputed facts are sufficient to prove liability under each theory because they demonstrate the Scyocurkas had a practice of using GEE assets to pay personal expenses and approved the transfer of significant GEE assets after it had become clear that GEE would be unable to repay more than $15 million it owed to KeyBank. He has not sought summary judgment on claims brought under the UFTA that require proof of an intent to defraud creditors (Counts II, VII, X, and XII) or the claim seeking to pierce the corporate veil (Count XVI).

Defendants filed a cross-motion for summary judgment as to all sixteen counts. (Dkt. No. 64.) They dispute the applicability of legal theories advanced by the Receiver and, to the extent any theory may be applicable, argue that significant factual disputes preclude summary judgment. For the reasons

that follow, the cross-motions for summary judgment are denied as to all counts, except that summary judgment shall enter for Roofing as to Counts XIV and XV.

.

## II.    PRIOR RELATED LITIGATION

In August 2019, GEE and the Scyocurkas filed a complaint in which they claimed KeyBank had breached an oral agreement to provide between $70 and $80 million in financing for future solar projects to be developed by GEE using a specific sale-leaseback financing model. KeyBank had previously provided other financing to GEE pursuant to several loans, each memorialized in written loan agreements. At the time the 2019 action was filed, GEE was current with interest payments required under those written loan agreements, but owed more than $15 million in principal. Together, GEE and the Scyocurkas, sought to compel KeyBank to compensate GEE for losses suffered because, after financing one solar project under the sale-leaseback model, KeyBank refused to finance any additional projects.

Shortly after filing their complaint, GEE and the Scyocurkas filed a motion for preliminary injunction in which they asked the court to enjoin KeyBank from terminating or calling in any existing loans or line of credit extended to them or requiring any payments of fees, interest, or principal under existing loans. (19-cv-30123-MGM, Mot. Prelim. Inj., Dkt. No. 5.) Consistent with the standard applied to motions for preliminary injunctions, they argued "the continued existence of GEE depend[ed] on the requested injunction," and GEE would, therefore, suffer irreparable harm in the absence of the relief requested. (19-cv-30123-MGM, Memo. Supp. Prelim. Inj., Dkt. No. 6 at 15.)

Largely due to the apparent potential for irreparable harm, the court granted the motion for preliminary injunction on a temporary basis while the record was further developed through briefing and oral argument on the motion for preliminary injunction and a motion to dismiss filed by KeyBank and the other defendants. (19-cv-30123-MGM, 10/19/2019 and 11/13/2019 Orders, Dkt. Nos. 38, 52;

Not. of 2/12/2019 Oral Order, Dkt. No. 63.) On January 10, 2020, the court vacated the temporary restrictions and denied the motion for preliminary injunction. (19-cv-30123-MGM, 1/10/20220 Order, Dkt. No. 66.) The court ruled GEE and the Scyocurkas "ha[d] not met their burden of demonstrating likelihood of success on the merits," because there was insufficient evidence that an enforceable agreement existed between GEE and KeyBank, which obligated KeyBank to provide $70 to $80 million in financing to GEE for the development of solar projects. (*Id.* at 15.) Referencing an affidavit from Christopher, the court observed that GEE was in a precarious business position, and it did not appear the injunction, if granted, would enable GEE to return to solvency. (*Id.* at 15-16.)

After the court denied the motion for preliminary injunction, GEE and the Scyocurkas sought leave to amend their complaint to add new claims related to KeyBank financing for a specific solar project unconnected with the sale-leaseback model. On September 21, 2020, the court granted the motion to file an amended complaint and, in the same order, dismissed the claims premised on KeyBank's alleged breach of an agreement to provide GEE with $70 to $80 million in financing for solar projects using the sale-leaseback model. (19-cv-30123-MGM, 9/21/2020 Order, Dkt. No. 78.) KeyBank filed a separate action against GEE, the Scyocurkas, and Green Earth Wamogo, LLC, the entity created for the one project financed using the sale-leaseback model. (20-cv-11984-MGM, Compl., Dkt. 1.) In that action, KeyBank sought to recover amounts owed by Grean Earth and the Scyocurkas pursuant to written loan agreements between the parties. The 2019 and 2020 actions were later consolidated. (19-cv-30123-MGM, 6/30/2021 Order, Dkt. No. 104.)

Shortly after KeyBank filed the 2020 action, it moved for appointment of a receiver "to take custody and control of the operation, management, income, property . . . and assets" of Green Earth, citing representations made a year earlier in the 2019 action regarding GEE's precarious financial position. (20-cv-11984-MGM, Mot. App't. Rec'r, Dkt. No. 20.) Counsel for the Scyocurkas opposed the appointment of the receiver, observing that GEE had not filed for bankruptcy in the year since

Christopher had described GEE's financial difficulties and noting that KeyBank had not alleged GEE "ha[d] engaged in any type of fraud, or . . . made any attempt to sell or damage the collateral property." (20-cv-11984-MGM, Opp. Mot. App't. Rec'r, Dkt. No. 25 at 7.) After extensive briefing and argument, the court appointed Stephen Darr as the permanent receiver for Green Earth and granted him exclusive authority and control over Green Earth, except that the Scyocurkas retained authority over GEE's interest in the ongoing litigation with KeyBank. (19-cv-30123-MGM, Order App't Rec'r, Dkt. No. 113 at 1-2.) The order appointing Darr directed him to "operate, manage and administer [Green Earth] in a commercially reasonable manner, with the intent to maximize the value of [Green Earth]." (*Id.* at 2.) He was specifically authorized to "[t]ake any action which could be taken by the officers, directors, managers, members, shareholders, partners, trustees or other principals of [Green Earth]." (*Id.* at 5, ¶ O.) Though KeyBank, as Green Earth's only creditor, was likely to benefit from the receiver's efforts,[3] Darr was appointed to act solely on behalf of GEE.

The Scyocurkas appealed the order appointing the receiver and sought a stay of the order, asserting, in part, that GEE "w[ould] be irreparably harmed without a stay" because the receiver intended to "sell off all of Green Earth's assets and leave it without any way to continue operating as a going business concern." (19-cv-30123-MGM, Mot. Stay Order, Dkt. No. 122 at 4.) Ten days later, Darr filed his first status report as Green Earth's receiver and informed the court that GEE had "wound down in 2019 and 2020," Christopher was the only remaining GEE employee, GEE assets had been sold to a related entity, and "no ordinary course business activity was being conducted" by GEE. (19-cv-30123-MGM, Rec'r Prelim. Status Rep., Dkt. No. 128 at 2.) Darr filed this action about 10 months later, while GEE, the Scyokurkas, and KeyBank continued litigating the claims in the consolidated action. (Compl., Dkt. No. 1.) In March 2024, the court granted KeyBank's motion for

---

[3] KeyBank is GEE's only creditor, and as receiver, Darr is permitted to remit available income to KeyBank to be applied against amounts GEE owed to KeyBank. (19-cv-30123-MGM, Order App't Rec'r, Dkt. No. 113 at 6.)

summary judgment in the consolidated action on all claims based on the application of unambiguous language contained in written loan agreements. (19-cv-30123-MGM, 3/29/2024 Order, Dkt. No. 309.) Several months later, the Receiver filed his motion for summary judgment in this case.

### III.    SUMMARY JUDGMENT STANDARD

"The function of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "[I]f there is a genuine dispute of a material fact, that dispute would 'need[] to be resolved by a trier of fact.'" *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002) (second alteration in original)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law,'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017), *abrogated on other grounds by Walsh v. HNTB Corp.*, _ F.4th _ (1st Cir. 2026)*, (quoting Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). The court must construe "the record evidence in the light most favorable to the nonmoving party.*" Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). All reasonable inferences must be drawn in favor of the non-moving party, but the court does not "draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Cherkaoui,* 877 F.3d at 23 (internal quotations omitted) (emphasis in original).

The court "may consider only evidence that would be admissible at trial." *Klauber v. VMware, Inc.*, 80 F.4th 1, 7 (1st Cir. 2023). In the District of Massachusetts, the presentation of such evidence

is governed by Local Rule 56.1, which provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." D. Mass. L.R. 56.1. Properly supported facts set forth by the moving party and not placed into dispute by record evidence cited by the opposing party are deemed admitted for purposes of the summary judgment motion. D. Mass. L.R. 56.1; *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."). Once established, undisputed facts must be viewed "in the light most favorable to the non-moving party," and the court must "draw all reasonable inferences in [the non-moving party's] favor." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018).

"The fact that the parties have filed cross motions . . . does not alter these general standards." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023). Each party's motion is reviewed "independently, viewing the facts and drawing inferences as required by the applicable standard." *Id.* However, the task of assembling a single set of undisputed facts is complicated when each party relies on the same properly supported statement of material fact to support their motion and oppose the cross-motion, rather than provide a paragraph-by-paragraph rebuttal to the other party's statement that identifies specific citations to contrary evidence. In such cases, it can be difficult to untangle whether summary judgment is appropriate, because the parties' only disagreement concerns the way the law applies to a set of uncontested facts, or whether summary judgment cannot be granted, because important facts must first be determined by a factfinder able to assess credibility and weigh admissible evidence.

## IV.   UNDISPUTED FACTS

Consistent with the requirements of Local Rule 56.1, both parties filed a statement of material fact listing facts in numbered paragraphs with supporting citations to specific pages of affidavits and other documents. (Dkt. Nos. 57, 65.) As neither party filed a response to the other party's statement that met the requirements of Local Rule 56.1,[4] the court considers properly supported facts appearing in either party's statement of facts to be undisputed, unless contradicted by a properly supported fact appearing in the opposing party's statement of material fact.

At the outset, the court notes that important financial information is omitted from this summary of undisputed facts because genuine disputes exist regarding these details. For example, the parties do not agree about when GEE became insolvent. Citing an expert report, the Receiver states that GEE "was insolvent as of January 17, 2018 and at all times thereafter," but he does not supply any facts underlying that conclusion, such as the value of GEE's assets and liabilities as of that date or any future date. (Dkt. 57, Pl.'s 56.1 Stmt. at 25.) Defendants dispute the claim, citing evidence that GEE's assets exceeded its liabilities at the end of 2018 and during 2019. There are also factual disputes about the correct characterization of transactions the Receiver describes as personal expenditures or loans to stockholders. While the amounts and recipients of the transactions are largely undisputed, Christopher contends the expenses were consistent with reasonable business purposes (Dkt. No. 68, C. Scyocurka Aff., ¶ 104), and the Receiver incorrectly reclassified payments made prior to the inception of the receivership on July 26, 2021 (Dkt. No. 68, ¶¶ 36, 103, 105). The Receiver points to an absence of corroborating documentation to support Christopher's statements, but the absence of

---

[4] Plaintiff did not file a response to Defendants' statement of material facts. Defendants did file a paragraph-by-paragraph response to Plaintiff's statement of material facts in which they labeled many facts as disputed; however, only one such label was supported by a specific citation to evidence in the record. *See* D. Mass. L.R. 56.1.

such evidence, though relevant to credibility and weight, does not provide a basis for this court to disregard Christopher's testimonial statements at this stage.

A.  GEE Operations Prior to 2017

GEE is a closely-held Massachusetts corporation. Christopher holds a sixty percent interest in GEE and Paige holds a forty percent interest in GEE. The Scyocurkas hold all offices and are the only members of GEE's board of directors. They claim to have funded GEE with more than $500,000 from their personal assets. Specifically, there is a $317,493 stockholder loan recorded on GEE's 2012 balance sheet. Christopher also contends that he contributed several thousand dollars that were not properly recorded in GEE's financial records.

The Scyocurkas began operating GEE from their home at 208 Shaker Road, Longmeadow, Massachusetts in 2007. Beginning in 2012, GEE paid the Scyocurkas rent for use of space in their Shaker Road home. During this period, the Scyocurkas formed Marine and approved the transfer of $650,000 from GEE to Marine for the purchase of a yacht. GEE used the yacht for business and marketing purposes. Meetings with vendors, lenders, and employees were held on the yacht and the yacht was adorned with GEE branding.

Both Christopher and Paige worked for GEE and drew salaries for their work. GEE also employed other members of the Scyocurka family. Their daughter, Taylor, started working for GEE in 2013. Initially she was an administrative assistant for her parents. Over time she took on additional responsibilities and was given the title of Vice President. From 2016 through 2019, Christopher's brother Todd was employed as GEE's Chief Financial Officer. His daughter, Laura Scyocurka, also worked for GEE, as did Christopher's brother, Gregory Scyocurka, and Gregory's wife, Anne Scyokurka. During this time, GEE leased office space in East Windsor, Connecticut, and most of its employees relocated to the East Windsor offices. Christopher, and later Todd, continued to work

10

primarily from the Shaker Road home and GEE continued to host business meetings and other corporate events at the home.

GEE's main business was designing, constructing, and operating solar systems that used photovoltaic panels to generate electricity and were interconnected to the electric grid. Residential and commercial property owners purchased solar systems, obtaining their own financing if needed. In addition to owning the components of their systems, customers also owned the electricity produced and all tax benefits and other incentives generated by the systems.

Around 2016, GEE decided to expand its business model to serve customers unable or unwilling to finance the full cost of a solar system. Rather than pay upfront to purchase a solar system, property owners could lease roof, or other spaces, to GEE and it would design, finance, install, and operate a solar system on the property. The property owners would pay for the system over time by purchasing the electricity generated. As the system owner, GEE would receive the tax benefits and other incentives. The new business model increased GEE's pool of potential customers, but it did not provide sufficient short-term income to pay the costs of designing and installing the systems. In December 2016, Christopher and Todd met with KeyBank employes to discuss options for financing GEE's new business model. Around this time, the Scyocurkas provided extensive and detailed financial information to KeyBank. This included GEE's financial statements and the Scyocurkas's personal tax return for 2015.

B.  Green Earth Operations 2017 Through 2018

GEE and KeyBank executed a set of loan agreements in May 2017. These included a Business Loan Agreement, the terms of which applied to all loans made by KeyBank to GEE, and two promissory notes, one for a "Working Capital Line of Credit" and another for a "Master Security Agreement." GEE initially borrowed $2.5 million under the Working Capital Line of Credit. Between

2017 and early 2019, KeyBank agreed to increase the amount GEE could borrow under the Working Capital Line of Credit. The Master Security Agreement provided a framework for GEE to borrow money to fund construction of specific solar projects. At the beginning of a project, KeyBank would issue a construction loan and a date was set for completion of the projection. Upon completion, GEE had the option to either repay the construction loan or execute a separate promissory note secured by the completed project. GEE completed fourteen solar projects with financing governed by the Master Security Agreement. These projects are owned by GEE and generate income. KeyBank also disbursed construction funds for two projects that were not completed on time. By the summer of 2018, KeyBank had disbursed more than $11 million under the Master Security Agreement.

In April 2018, KeyBank and GEE began discussing a new financing structure, the sale-leaseback model. Under the sale-leaseback model, GEE would continue to market, design, install, and operate solar systems on leased properties, but after a solar system was complete and interconnected, KeyBank would purchase the system, including all associated tax benefits and incentives. KeyBank would then lease the system back to GEE, which would use revenue from electricity sales to make lease payments. Although KeyBank and GEE did not have a written agreement defining the scope or terms for projects to be financed using the sale-leaseback model, Christopher contends GEE spent approximately $6 million preparing for a high volume of new projects that it expected to finance using the sale-leaseback model.

KeyBank and GEE agreed to use the sale-leaseback financing model for one solar project in Wamogo, Connecticut. The Scyocurkas created Green Earth Wamogo, LLC ("GEW") to operate the project and make monthly lease payments to KeyBank. As with GEE, Christopher owns 60% of GEW, and Paige owns 40%. Christopher expected that after the financing for the Wamogo project was completed in September 2018, KeyBank would provide similar financing for GEE projects, but KeyBank did not do so. Around the same time, delays by the Commonwealth of Massachusetts

prevented GEE from completing a solar project funded under the Master Security Agreement. On October 21, 2018, GEE informed KeyBank that it would need to borrow an additional $1 million to meet upcoming operational expenses. KeyBank informed GEE that it would not fund new solar projects unless GEE improved its cash situation.

C.      Green Earth and Roofing Operations 2019 Through 2020

In January 2019, KeyBank informed GEE that it would no longer lend GEE money for new projects and that it was focused on completion of the two unfinished solar projects. That same month, the Scyocurkas loaned Taylor $800,000 to fund Roofing. On or before February 15, 2019, Roofing paid $138,000 to purchase certain personal property from GEE. In March or April 2019, Taylor used a $354,000 distribution from Roofing to repay the loan from her parents.

Taylor formed Roofing in 2016 and is its sole member. In 2016, Taylor and some GEE employees sought certification to install a proprietary roofing product. Afterwards, Taylor, acting through Roofing, submitted unsuccessful bids for a number of public roofing projects. Between 2016 and the end of 2019, Roofing had no employees and total gross revenue of $2,000.

KeyBank issued a notice of default to GEE on May 29, 2019. GEE continued making required interest payments to KeyBank until the Scyocurkas and GEE filed their complaint against KeyBank. On December 31, 2019, just weeks after GEE argued that ongoing relief from interest payments would enable it to continue operating, and before the court issued a ruling on the pending motion for preliminary injunction, GEE laid off all its employees except Christopher, Todd, Paige, and GEE's Master Electrician, Bryan Menard. By February 2020, Christopher was GEE's only employee.[5]

---

[5] Menard briefly became an employee of Roofing before being rehired by GEE later in 2020. Around December 2020, Menard returned to Roofing and was employed by Roofing until September 2022.

13

Nonetheless, GEE continued to lease office space in East Windsor, Connecticut and pay rent to the Scyocurkas for use of the Shaker Road home.

As GEE's sole employee, Christopher generated income for GEE by selling new solar projects, but all other work previously done by GEE employees was conducted by Roofing pursuant to three contracts. Roofing employees completed administrative tasks; performed operations, reporting, monitoring, and maintenance work; and designed and installed solar systems sold by Christopher. GEE paid Roofing $305,000 upon commencement of the contract under which Roofing agreed to provide GEE with engineering, procurement, and construction services. Roofing also received initial deposits for administrative and management work.

In early 2020, Roofing hired approximately thirty former GEE employees, including Paige, Todd, Laura Scyocurka, and Gregory Scyocurka. Roofing leased office space in the same East Windsor building where GEE leased office space. A lease for a commercial property in Ludlow Mills was changed so that Roofing replaced GEE as the lessee. Roofing also began using multiple vehicles owned and insured by GEE. The vehicles were later purchased by Roofing, but for approximately eleven months, Roofing used the vehicles without making any payments to GEE. Roofing also began using equipment owned by GEE in early 2020, approximately a year before purchasing the equipment from GEE for $139,782. During 2020, Roofing engaged in the same type of business GEE carried out in 2019. At the end of 2020, Roofing had a net profit of about $1 million.

## V.    DISCUSSION

### A.  Breach of Fiduciary Duty

The Receiver contends the Scyocurkas owed duties of good faith, loyalty, and care to Green Earth, and, aided and abetted by Taylor and Todd, breached those duties by approving expenditures that benefitted themselves or family members and did not serve Green Earth's business interests. He

argues GEE is entitled to summary judgment because undisputed facts establish the Scyocurkas impaired GEE's ability to repay its creditors by (1) extracting $1,668,836.17 in value from GEE in the form of improvements to their personal assets or shareholder loans that have not been repaid and (2) by approving GEE's payment of $1,719,204.26 in personal expenses between January 1, 2018 and July 26, 2021. Defendants counter that they are entitled to summary judgment on these claims because, as the only owners of Green Earth, the Scyocurkas owed fiduciary duties to each other, but did not owe any fiduciary duties directly to Green Earth. Alternatively, they contest the Receiver's categorization of the transactions and his claim that the payments harmed Green Earth.[6]

GEE is a closely-held Massachusetts corporation, and a corporation, whether or not closely-held, "is an independent legal entity, separate and distinct from its shareholders, officers, and employees."[7] *Spaneas v. Travelers Indem. Co.*, 668 N.E.2d 325, 326 (Mass. 1996). The actions of a corporation must, of course, be directed by one or more individuals, and "the general rule of

---

[6] Defendants have also argued that the pending action doctrine and the in pari delicto doctrine foreclose the Receiver's claims against the Scyocuras. These arguments are entirely without merit.

The pending action doctrine is inapplicable here because the parties and claims at issue in the consolidated action are not identical to the parties and claims in this action. *Quality One Wireless, LLC v. Goldie Grp., LLC*, 37 F. Supp. 3d 536, 540 (D. Mass. 2014) ("Under the prior-pending-action doctrine, 'the pendency of a prior action, in a court of competent jurisdiction, between the same parties, predicated upon the same cause of action and growing out of the same transaction, and in which identical relief is sought, constitutes good ground for abatement of the later suit.'"(quoting *O'Reilly v. Curtis Pub. Co.*, 31 F. Supp. 364, 364-65 (D. Mass. 1940))).

"The doctrine of in pari delicto bars a plaintiff who has participated in wrongdoing from recovering damages for loss resulting from the wrongdoing." *Choquette v. Isacoff*, 836 N.E.2d 329, 332 (Mass. App. Ct. 2005). Here, the Receiver has brought an action on behalf of a corporation, GEE, to recover losses that allegedly stem from fraudulent transactions taken solely for the personal benefit of the individuals who controlled the corporation before the Receiver was appointed. The only claims are brought by the corporation, acting through the Receiver, directly against those alleged to have obtained improper personal benefits from the corporation; no other parties are involved. *Compare Fine v. Sovereign Bank*, 634 F. Supp. 2d 126, 138-39 (D. Mass. 2008) (applying in pari delicto defense to prevent a receiver acting on behalf of a corporation from seeking damages from a bank for a fraud carried out by the corporation through its sole director and shareholder.)

[7] The Receiver asserts these claims on behalf of both GEE and GEW; however, as GEW is not a corporation, the court analyzes this claim as though it is asserted solely by GEE.

Massachusetts corporate law is that a director of a Massachusetts corporation owes a fiduciary duty to the corporation itself." *Int'l Bhd. of Elec. Workers Loc. No. 129 Benefit Fund v. Tucci*, 70 N.E.3d 918, 926 (Mass. 2017). This fiduciary duty requires directors to act with "'reasonable intelligence' in the oversight of corporate business." *Blackstone v. Cashman*, 860 N.E.2d 7, 17 (Mass. 2007). Claims for breach of this duty belong to the corporation, not individual shareholders. *Bessette v. Bessette*, 434 N.E.2d 206, 207-08 (Mass. 1982) ("It is a basic principle of corporate law that if a majority shareholder receives corporate cash distributions and salary in excess of the reasonable value of services rendered, the right to recover the overpayments belongs to the corporation."). "[C]orporations have the power to sue," and, typically, "the power to decide whether the corporation should sue is vested in either the board of directors or the stockholders."[8] *Houle v. Low*, 556 N.E.2d 51, 57 (Mass. 1990) (emphasis removed). The court gave this power to the Receiver when it granted him authority to "[t]ake any action which could be taken by the officers, directors, managers, members, shareholders, partners, trustees or other principals of [Green Earth]." (19-cv-30123-MGM, Order App'ting Rec'r, Dkt. No. 113 at 5, ¶ O.)

A plaintiff must establish four elements to prevail on a claim for breach of fiduciary duty: "(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages." *Baker v. Wilmer Cutler Pickering Hale & Dorr LLP*, 81 N.E.3d 782, 789 (Mass. 2017). If a factfinder presented with the undisputed facts would be required to find that each of these elements is satisfied, the Receiver is entitled to summary judgment. Alternatively, Defendants are entitled to summary judgment if the undisputed facts would preclude a factfinder from finding at least one of these elements. Finally, summary judgment cannot be granted

---

[8] In *Donahue v. Rodd Electrotype Co. of New England*, the Massachusetts Supreme Judicial Court held that shareholders of close corporations "owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." 328 N.E.2d 505, 515 (Mass. 1975). This is an independent, fiduciary duty for shareholders in close corporations that does not replace the fiduciary duties directors owe to the corporation. *Tucci*, 70 N.E.3d at 926; *see also* Mass. Gen. Laws c. 156D, § 8.30.

if a factfinder must resolve one or more factual disputes before the court can determine whether the elements are met (or cannot be met).

The Scyocurkas were the sole directors and shareholders of GEE, and that undisputed fact suffices to establish the first element. Although the amounts and recipients of payments made by GEE is not disputed, the benefits conferred by the payments are contested. The Receiver claims the expenditures were made solely for the Scyocurkas's personal benefit. Defendants dispute that classification, and contend that the payments were consistent GEE's business interests and the Scyocurkas acted in good faith when they approved the expenses. On their face, most, if not all, of the payments provided personal benefits to the Scyocurkas or their family members. Such transactions are properly subjected to "vigorous scrutiny" and the burden is on the directors who approved the transactions to prove they were undertaken in good faith and inherently fair to the corporation. *Crowley v. Comms. For Hospitals, Inc.*, 573 N.E.2d 996, 1000 (Mass. App. Ct. 1991). At the same time, whether any specific expenditure was reasonable is a question of fact that must be answered after considering the "quantity and quality of the services" rendered to the corporation, as well as the corporation's growth and profitability. *Rubin v. Murray*, 943 N.E.2d 949, 961-62 (Mass. App. Ct. 2011). Given the record presented by the parties, this determination must be left to a factfinder able to weigh conflicting evidence and assess credibility.

Factual disputes also preclude the court from reaching any conclusions about the third and fourth elements, damages and the causal connection between the breach and damages. Understandably, the Receiver takes the position that, as early as January 2018, improper personal expenditures deprived GEE of assets needed to service its debt and contributed to its eventual insolvency. On the other hand, the Scyocurkas claim the expenditures would not have caused GEE any harm if, during the second half of 2018, KeyBank had provided GEE with the amount and type of financing anticipated by the Scyocurkas. The court recognizes that the body of undisputed facts

17

supports applying greater scrutiny to expenditures made after KeyBank informed GEE that it would not continue providing financing for new solar projects. However, the court is unable to draw conclusions about payments made during more limited periods because the Receiver has provided only aggregate expenses for the entire period from January 1, 2018 through July 26, 2021.

As to the aiding and abetting claims, the first of the three required elements is the existence of a breach of fiduciary duty. *Baker*, 81 N.E.3d at 847 ("The elements of the tort of aiding and abetting a breach of fiduciary duty are: (1) there must be a breach of fiduciary duty; (2) the defendants must know of the breach; and (3) the defendants must have actively participated or substantially assisted in or encouraged the breach to such a degree that they could not reasonably have been acting in good faith."). Since summary judgment cannot be entered on the Receiver's claim that the Scyocurkas breached their fiduciary duties to GEE (Count I), the court also cannot enter judgment on the claim that Taylor and Todd aided and abetted such a breach (Count IX).

B.  Uniform Fraudulent Transfer Act

The UFTA "provides a means by which a creditor may avoid transfers intended to frustrate the creditor's claims." *Bakwin v. Mardirosian*, 6 N.E.3d 1078, 1084 (Mass. 2014). A creditor is defined as "a person who has a claim," a debtor is "a person who is liable on a claim," persons include corporations, and a claim is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Mass. Gen. Laws ch. 109A, § 2. "The statute does not create new claims, nor does it contemplate placing the creditor in a more favorable position than would have existed without the fraudulent transfer." *Bakwin*, 6 N.E.3d at 1084. "[A] range of possible remedies and forms of judgment [can] be entered against a fraudulent transferor or transferee in order to aid a creditor in obtaining repayment of a debt." *Id.*

18

Whether a transfer is fraudulent depends on several factors, including whether the debtor made the transfer before or after the creditor's claim arose. Mass. Gen. Laws ch. 109A, §§ 5 and 6. Under § 5(a)(1) of the UFTA, a transfer made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is "fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made." *Id.* at § 5(a). A claim brought pursuant to § 5(a)(1) is extinguished unless brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation could reasonably have been discovered by the claimant." *Id.* at § 10(a). Transfers, whether made before or after a creditor's claim arose, are also fraudulent if the debtor made the transfer "without receiving a reasonably equivalent value in exchange," and either (1) "was engaged or was about to engage in a business or transactions for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" or (2) "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." *Id.* at § 5(a)(2). Under § 6(a) of the UFTA, a transfer is "fraudulent as to a creditor whose claim arose before the transfer was made" if the transfer was made by a debtor who did not receive a reasonably equivalent value in exchange and the debtor was either insolvent at the time of the transfer or the transfer caused the debtor to become insolvent. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation," and "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." *Id.* at § 3. Claims brought under either § 5(a)(2) or § 6(a) of the UFTA are extinguished unless brought "within four years after the transfer was made." *Id.* § 10(b). Finally, a transfer is fraudulent under the UFTA as to a claim arising before the transfer, if the transfer was made "to an insider for an antecedent debt," the debtor was insolvent at the time, and "the insider had reasonable cause to believe that the debtor was insolvent." *Id.* at § 6(b). Claims asserted pursuant to § 6(b) are

extinguished unless brought "within one year after the transfer was made or the obligation was incurred." *Id.* at § 10(c).

The Receiver has invoked the UFTA to avoid transfers GEE made to the Scyocurkas, their family members, Marine, and Roofing, and recover the value of those transfers from GEE insiders: the Scyocurkas, Taylor, Marine, and Roofing. He does not seek summary judgment on the claims brought under § 5 of the UFTA (Counts II, VII, X, and XII), but argues the undisputed facts are sufficient to support summary judgment on the UFTA claims brought under § 6 (Counts III, VIII, XI, and XIII). Specifically, he contends it is beyond dispute that GEE did not receive reasonably equivalent value in exchange for the transfers, and either was insolvent when the transfers were made or became insolvent because of the transfers. Defendants contend they are entitled to summary judgment because the Receiver's claims are untimely as to any transfer that occurred prior to June 1, 2018. They also contend the undisputed facts are consistent with an entirely different explanation. In their version of events, the Scyocurkas, Taylor, and others put in extremely long hours to build GEE into a successful company. GEE profited from those efforts and made a reasonable business decision to support such intensive efforts by paying related costs. The expenses were reasonable when considered within the context of GEE's past and anticipated growth, and did not significantly contribute to GEE's eventual insolvency, which was caused by KeyBank's unforeseen decision to stop financing new GEE solar projects.

The court turns first to Defendants' contention that summary judgment should enter in their favor as to any transfers GEE made prior to June 1, 2018, the date four years prior to the filing of this action on June 1, 2022. As noted above, the applicable statute of limitations for UFTA claims varies depending on the subsection under which the claim is asserted: A four-year statute of limitations for claims brought under § 5 and § 6(a); a shorter one-year limitations period applies to claims brought under § 6(b); and the four-year period is extended for claims brought under § 5(a) until the end of the

first year after the claimant discovered, or reasonably could have discovered, the fraudulent transfer. Mass. Gen. Laws 109A; § 10. The Receiver argues the UFTA limitations periods were tolled by the adverse domination doctrine. Since 2006, Massachusetts has recognized the doctrine of adverse domination as a form of equitable tolling applicable to claims brought on behalf of a corporation when "the plaintiff can show the absence of any corporate director or shareholder who had actual knowledge of the alleged wrongdoing and the ability (and motivation) to sue the wrongdoers on behalf of the corporation." *Aiello v. Aiello*, 852 N.E.2d 68, 72 (Mass. 2006). As the Scyocurkas are GEE's only shareholders and directors, the court finds the adverse domination doctrine applies and the applicable limitations periods did not begin to run until after the Receiver was appointed on July 26, 2021.

Turning to the alleged fraudulent transfers, the same factual disputes discussed above regarding the interests served by the expenditures and GEE's financial condition during 2018 and 2019 foreclose summary judgment on to the UFTA claims. The Receiver has categorized the contested transfers as shareholder loans or personal expenditures made solely for the Scyocurkas benefit and providing no benefit to GEE's business, while Christopher contends the amounts expended were reasonable and furthered legitimate business purposes. Only a factfinder, tasked with assessing credibility and weighing evidence, can determine whether GEE received reasonably equivalent value in exchange for any of the transfers, and at what point GEE became insolvent for purposes of the UFTA. Accordingly, summary judgment is denied as to all of claims brought under the USFTA (Counts II, III, VII, VIII, X, XI, XII, and XIII).[9]

---

[9] As framed by the Receiver, GEE is both the debtor and creditor as those terms are defined in the UFTA. The court expresses some skepticism about the applicability of the UFTA to such a situation. As neither party has presented argument on this point, the court declines to rely on it as a basis for granting summary judgment to Defendants on the UFTA claims.

C. Outstanding Shareholder Debt

The Receiver also seeks summary judgment on his claim that GEE is entitled to repayment of shareholder loans GEE provided to the Scyocurkas. Defendants have not identified any legal defenses against the claim, but have placed the amount owed into dispute. As discussed above, Christopher claims the Receiver has calculated the amount the Scyocurkas owe GEE using inaccurate financial records. Specifically, he contends (1) the expenses the Receiver has categorized as loans to GEE shareholders were made for the benefit of GEE, and (2) the Scyocurkas loaned significant sums to GEE, that were not repaid, and are liable to repay loans from GEE only to the extent the value of such loans exceeds the amount they loaned to GEE. The court concludes that summary judgment cannot enter on this claim (Count IV) because there are genuine disputes regarding the amount, if any, actually owed by the Scyocurkas.

D. Liability for Improper Distributions

Under Massachusetts law, the directors and shareholders of a corporation are "personally liable to the corporation" for improper distributions to its shareholders approved by the directors or received by the shareholders. Mass. Gen. Laws c. 156D, § 6.41. Improper distributions include any distribution

> made by a corporation which is a going concern if, after giving it effect,
>
> (1) the corporation would not be able to pay its existing and reasonably foreseeable debts, liabilities and obligations, whether or not liquidated, matured, asserted or contingent, as they become due in the usual course of business; or
>
> (2) the corporation's total assets would be less than the sum of its total liabilities plus, unless the articles of organization permit otherwise, the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

Mass. Gen. Laws c. 156D, § 6.40(c).

As GEE's only directors and shareholders, the Scyocurkas are personally liable to GEE for improper distributions. However, even with the existence of a clear legal basis for liability, summary judgment cannot enter on these claims (Counts V and VI). Genuine factual disputes prevent the court from crediting either party's categorization of GEE expenditures or the impact particular expenditures, especially those made prior to October 2018, had on GEE's ability to pay its reasonably foreseeable debts as they became due.

### E. Successor or Alter Ego Liability

Finally, the court turns to the Receiver's claims Roofing is liable to Green Earth either as its successor-in-interest (Count XIV) or its alter ego (Count XV). Defendants contend the evidence does not support the high standard that must be met for a court to find a "de factor merger" between GEE and Roofing or that there was common control of the two entities sufficient to permit the court to treat them as a single legal entity. The court agrees that the undisputed facts are insufficient to support the Receiver's claims for summary judgment. Additionally, after reviewing the cases cited by the Receiver, the court concludes that summary judgment on these claims should enter in favor of Roofing. The plaintiffs in *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244 (Mass. 2008), and *My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748 (Mass. 1968), were creditors of one corporation seeking to recover unsecured debt from a related, but separate business entity. As the Supreme Judicial Court explained in *Milliken*, "[t]he public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors." 887 N.E.2d at 255. That policy is not furthered in a case like this where the plaintiff is the corporation that incurred debt, not an innocent corporate creditor whose efforts to obtain repayment have been frustrated by coordinated actions taken by the debtor and another entity. Regardless of how much Green Earth owes KeyBank, the Receiver does not stand in the shoes of Green Earth's creditor. He acts on behalf of Green Earth

23

and can only bring claims that belong to Green Earth. For this reason, the court grants Defendants' cross-motion for summary judgment as to the successor-in-interest (Count XIV) and alter ego (Count XV) claims asserted against Roofing.

## VI.    CONCLUSION

For the reasons discussed above, the Receiver's motion for summary judgment (Dkt. No. 54) is DENIED and Defendants' cross-motion for summary judgment (Dkt. No. 64) is GRANTED as to Counts XIV and XV, and DENIED as to all other counts. An initial pretrial conference, to be conducted remotely, is set for April 16, 2026 at 11:30 AM, and a trial date is tentatively set for July 13, 2026.

It is so Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge